

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 15, 2016 Session

## STATE OF TENNESSEE v. ROBERT GRISHAM

### Appeal from the Criminal Court for Knox County
### No. 104067     G. Scott Green, Judge

_____

### No. E2015-02446-CCA-R3-CD

_____

Following a jury trial, the Defendant, Robert Grisham, was convicted of observation without consent, unlawful photography, and especially aggravated sexual exploitation of a minor. In this appeal of right, the Defendant challenges the following: (1) the trial court's denial of his motion to suppress the deleted files retrieved from his cell phone using highly-sophisticated equipment; (2) the sufficiency of the evidence supporting his conviction for especially aggravated sexual exploitation of a minor, arguing that there was insufficient proof of "sexual activity" by "lascivious exhibition" on the video; and (3) the trial court's enhancement of his sentencing term for especially aggravated sexual exploitation of a minor to nine years by utilizing the abuse of private trust enhancement factor. In light of our supreme court's recent decision in State v. Whited, 506 S.W.3d 416 (Tenn. 2016), we conclude that the proof was insufficient to support the element of sexual activity and are, therefore, required to reverse and vacate the Defendant's conviction for especially aggravated sexual exploitation of a minor. However, because the proof is sufficient to support the lesser-included offense of attempted especially aggravated sexual exploitation of a minor, which was charged to the jury, we remand this matter to the trial court for entry of an amended judgment reflecting a conviction for attempt and for resentencing on this modified conviction. The Defendant's convictions for unlawful photography and observation without consent are affirmed. Accordingly, the trial court's judgments are affirmed in part and reversed in part, and the case is remanded for a new sentencing hearing.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Reversed in Part; Case Remanded

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

R. Deno Cole, Knoxville, Tennessee, for the appellant, Robert Grisham.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Charme P. Allen, District Attorney General; and Ashley D. McDermott, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
FACTUAL BACKGROUND

This case stems from a hidden-camera video recorded by the Defendant on his cell phone of his fourteen-year-old step-daughter's ("the victim") showering in their home's bathroom. Additionally, during a subsequent search of the Defendant's phone, officers recovered two still images of the Defendant's step-daughter naked and four images allegedly showing digital penetration of a six-month-old infant. Thereafter, on August 19, 2014, a Knox County grand jury returned a twelve-count presentment against the Defendant, charging him with three counts of especially aggravated sexual exploitation of a minor; one count of observation without consent; one count of unlawful photography; and seven counts of sexual exploitation of a minor. See Tenn. Code Ann. §§ 39-13-605, -13-607, -17-1003, -17-1005.

*I. Motion to Suppress Hearing*

On December 5, 2014, the Defendant filed a motion to suppress the evidence obtained from his cell phone, arguing that Knoxville Police Department ("KPD") Investigator Keith Johnson, assigned to the "family crimes or special crimes unit[,]" "obtained [the] Defendant's cell phone without a warrant and as a result of force, threat, trickery, or coercion." The trial court held a hearing on the motion, at which Inv. Johnson and the Defendant's wife testified.

According to Inv. Johnson, the initial August 8, 2014 complaint in this case came from Halls High School personnel after they had received information that a student's step-father had videotaped her while getting in and out of the shower. Inv. Johnson testified that, originally, a Knox County detective went to the high school to investigate and made contact with the victim. After the victim's disclosures, a "Child Help" forensic interview was scheduled for later that same day. During that interview, it was discovered that the crime actually occurred in the City of Knoxville, so the case was referred to Inv. Johnson.

Inv. Johnson maintained that, although the victim was unsure when the recording was made, she had only recently become aware of the video "when she heard her mother talking about it." According to Inv. Johnson, the victim reported the incident in "close proximity" thereafter.

That evening, Inv. Johnson spoke with the Defendant and his wife in the front lobby of the Family Justice Center ("FJC"). The Defendant's wife was already present at the FJC when the Defendant arrived. Inv. Johnson supposed that the Defendant drove himself "freely and voluntarily" to the FJC because the Department of Children's Services ("DCS") needed some paperwork signed that concerned the couple's children. Both DCS and Inv. Johnson's office were located inside the FJC. Inv. Johnson described the FJC's lobby as a waiting room with four or five chairs, "probably [twenty-five] feet wide, probably [fifteen] feet long," with "two double doors in the front" and an elevator. According to Inv. Johnson, the Defendant was not placed in handcuffs at any time while they spoke, and he was always free to leave.

Another investigator and a DCS case worker were also present with Inv. Johnson when he talked with the Defendant and his wife about the victim's allegations. As they were conversing, the Defendant pulled his cell phone out of his bib overalls to check his messages or answer a phone call. Inv. Johnson admitted that he "grabbed" the cell phone from the Defendant's hand without permission and that he then gave cell phone to the other investigator to place it in Inv. Johnson's office for safe keeping. Inv. Johnson stated that he seized the cell phone from the Defendant because the minor victim had said she had been filmed naked getting in and out of the shower on that phone. According to Inv. Johnson, the victim had also provided a description of the Defendant's cell phone, and the phone that the Defendant took out of his bib pocket matched her account. Inv. Johnson testified that he "received the information about the description of the phone and that the phone was used to do the videotape" about thirty minutes prior to meeting with the Defendant.

After seizing the Defendant's phone, Inv. Johnson informed the Defendant that he could either consent to a search of his cell phone or that a warrant would be applied for to search it. Inv. Johnson said that he then returned to his office for approximately five to ten minutes to make sure the phone was secured properly into evidence, thus, allowing the Defendant "a moment to think about what he wanted to do[.]" Ultimately, Inv. Johnson turned the Defendant's phone over to the Internet Crimes Against Children unit ("ICAC"), and they conducted the search.

When Inv. Johnson returned to the front lobby, the Defendant "pretty quickly" agreed to give consent to search, according to Inv. Johnson. Inv. Johnson said that he then read aloud the consent form to the Defendant, that the Defendant indicated his understanding of the form, and that the Defendant thereafter signed it. Because Inv. Johnson was now alone with the couple, the Defendant's signature on the consent form was attested to and witnessed by his wife. Inv. Johnson relayed that the Defendant left the FJC by himself after signing the consent form.

The Defendant's wife and the victim's mother, A.G.,[1] testified that she had three daughters, that the victim was the middle child, that the older two were from a previous marriage, and that the Defendant was the father of her youngest. A.G. was at Halls High School on August 8, 2014, "picking up supplies and stuff for a band event the next day[,]" when the victim entered the band room accompanied by two females, one a DCS case worker named Rhea Lundy. Ms. Lundy informed A.G. of the allegations the victim made against the Defendant and A.G. Thereafter, the victim and her older sister had to be taken to Child Help for forensic interviews, so A.G. had to call her parents to accompany the girls given that she was prohibited from being involved.

Around 4:00 p.m. that afternoon, A.G. received a phone call from Ms. Lundy to come to the FJC "to discuss what was going to go forward with the children." When A.G. arrived at the FJC about thirty minutes later, she found her parents and all three of her daughters in the lobby. Shortly thereafter, Ms. Lundy escorted all of A.G.'s family into the elevator and upstairs, and A.G. was left sitting alone in the lobby. According to A.G., the Defendant showed up at the FJC sometime around 5:15 or 5:30 p.m.

A.G. testified that Inv. Johnson, along with another investigator, came and sat down and talked with her and the Defendant about the victim's allegations, which involved the video on the Defendant's cell phone of the victim while showering. A.G. was asked about the circumstances surrounding Inv. Johnson's seizure of the Defendant's cell phone:

> [His] cell phone went off, it just vibrates, no ringtone to it, so he was trying to silence it, took it out of the bib pocket of his overalls, and as he was turning it off[, Inv.] Johnson asked him if that was his cell phone and he said—my husband said, "Yes", and [Inv. Johnson] grabbed it forcibly out of his hand, handed it off to the other investigator with him, and she took it out of the room at that time, and he told us that we would not be getting the phone back until it had been searched.

A.G. testified that they asked for the phone back "as soon as" Inv. Johnson took it, but "he made it very clear it would not be given back to [them]" either until voluntary consent had been given or a search warrant had been obtained and the phone searched. She claimed that they asked for the phone back several times while at the FJC.

According to A.G., Inv. Johnson explained to them that he would not be able to obtain a search warrant until Monday morning because it was already "after hours on Friday," but if they "wanted to expedite the process and get [their] children back

---

[1] It is the policy of this court to protect the identity of minors who were the victims of sexual crimes. To further this policy, we refer to the minor victim's relatives by their initials only.

sooner[,]" then the Defendant should "go ahead and sign a consent form allowing . . . them to search the phone." A.G. testified that Inv. Johnson referenced "speed[ing] the process along" to get the girls home faster "a couple of times" during their conversation. Additionally, A.G. estimated that it was "more like [thirty] minutes" that Inv. Johnson was gone to his office after seizing the phone. She based this belief on the facts that the Defendant was self-employed as an "electrician in heating and air," that they asked Inv. Johnson to find out if they could get the business information off of the Defendant's phone and if they could get the number transferred to another phone so the Defendant could continue to conduct business, and that Inv. Johnson "was gone for a while to get all those answers."

During the time A.G. and the Defendant were alone while Inv. Johnson was away in his office, she and the Defendant discussed whether the Defendant should sign a consent form based upon "what was on the phone and what might not be on the phone[.]" According to A.G., although the Defendant was aware that "there was a video that had been made like they were alleging[,]" he also knew that the video had been deleted off of the cell phone. Furthermore, A.G. admitted that she had previously seen the video on June 21, 2014, and that she was the one who had deleted the video at that time. She said that she deleted the video to keep it from "fall[ing] into the wrong hands." Nonetheless, A.G. acknowledged, "[W]e figured it was possible [the video] could be recovered." The Defendant did not admit to her that any other questionable items were on his cell phone. If there was other material, it "was deeply hidden," according to A.G., "somewhere that a normal person couldn't get to."

A.G. said that, when Inv. Johnson returned to the FJC lobby, they again discussed signing a consent form, but the Defendant only agreed when Inv. Johnson told them they were not getting the phone back "no matter what[.]" A.G. believed that it was around 7:00 p.m. when the consent form was signed. After signing, they asked if the Defendant was allowed "to leave so that he could go to U.S. Cellular before they closed and get another cell phone[,]" and Inv. Johnson answered affirmatively. However, they did not feel free to leave, according to A.G., because they were still working with Ms. Lundy on signing papers giving A.G.'s parents temporary custody of the children, and Ms. Lundy told them they "were not free leave until all [that] paperwork had been signed." Moreover, the doors were locked because "it was after hours at that point[,]" A.G. testified, and "no one could walk in unless they [had] a badge or key[.]"

A recording of the couple's interactions with Inv. Johnson while signing the consent form was played for the court. We glean from the record that there were two conversations taped—one approximately five minutes in length and one approximately

-5-

nine minutes in length.[2]  Apparently, during one conversation, the time was noted as 7:45 p.m., and Inv. Johnson commented, "Since there's nobody else here with me, will you sign this as the witness?"  A.G. testified that they did not know they were being recorded and that she was just learning of this at the suppression hearing.

After listening to the recording, A.G. confirmed that she had interacted with ICAC approximately three years earlier.  A.G. said that she contacted ICAC when she intercepted a communication from an eighteen or nineteen-year-old boy to the victim, who was eleven at the time, "requesting her to send nudes of herself to him."[3]  Although ICAC took the phone, "they did nothing," according to A.G., and no report was ever filed.  The Defendant was aware of this prior experience with ICAC.

At the conclusion of the hearing, the trial court denied the Defendant's motion to suppress the evidence.  The case proceeded to trial.

*II. Trial*

At the outset, the State dismissed three counts of sexual exploitation of a minor, leaving four counts of that offense.  The Defendant proceeded to a trial by jury on the remaining nine counts—Count 1, especially aggravated sexual exploitation of a minor, involving the video of the victim; Count 2, especially aggravated sexual exploitation of a minor, involving one of the naked still images of the victim; Count 3, especially aggravated sexual exploitation of a minor, involving the other naked still image of the victim; Count 4, observation without consent; Count 5, unlawful photography; and Counts 6 through 9,[4] sexual exploitation of a minor, involving the four pictures of an alleged six-month-old infant's vagina in various stages of being digitally penetrated.

A. Police investigation and forensic evidence.  Inv. Johnson provided much of the same testimony on direct examination at trial regarding his interactions with the Defendant and A.G. at the FJC.  Additionally, Inv. Johnson testified that he asked the Defendant if he had a video of the victim naked on his phone, and the Defendant replied "that there would not be anything on the phone."  According to Inv. Johnson, the Defendant never admitted that there was a video on the phone and never provided any explanation for making such a video.

---

[2]  This recording was marked as an exhibit for identification purposes, but it was never entered into the record.  In addition, it is not a part of the record on appeal.

[3]  At trial, A.G. testified that the boy was eighteen and that the victim was twelve when this occurred.

[4]  These Counts had been renumbered based upon the dismissal of the superseding counts.

On cross-examination, Inv. Johnson was asked to read a portion of the consent form signed by the Defendant: "These officers are authorized by me to secure phone call history, phone contact list, photos, videos and text messages contained on my phone." Defense counsel asked Inv. Johnson, "[W]ouldn't you agree that it would be a fair interpretation from [the Defendant's] standpoint" that the search would be limited to "what's set forth in the consent form[?]" Inv. Johnson replied, "I mean, you know, everybody feels differently, but . . . most people would assume that that would mean anything that is there on the telephone." During re-direct, Inv. Johnson clarified that the Defendant was informed that there would be "a complete examination" of his cell phone.

Sergeant Scott Sheppard testified that he had worked in ICAC since 2007, and he provided his credentials concerning computer forensics of mobile devices. Sgt. Sheppard received the Defendant's phone from Inv. Johnson, who had asked him to examine the phone for a video of a minor red-headed female's showering.

During his examination using "XRY" software for mobile devices, Sgt. Sheppard discovered two "thumbnail" images of a red-headed teenager naked in a bathroom. According to Sgt. Sheppard, these two images were on the phone's "internal memory" and were "last modified" approximately four minutes apart on November 16, 2013. Sgt. Sheppard explained what he meant by last modified:

> Modified date can be any user. Actually the operating system can sometimes make modifications of files, but usually on a mobile system that's a user input modification. . . . If you go in to delete a file, if you make any change to a file, the operating system knows the date and time that it was modified.

These two thumbnail images reflected some movement indicating to Sgt. Sheppard that they were part of a video. Because Sgt. Sheppard could not also find the same full-size images on the phone, he opined that they had been deleted.

After learning that the victim had a distinctive birthmark on her leg, Sgt. Sheppard found another thumbnail image of the victim on the phone's memory. It was a picture that was taken from a side angle of the victim's lower torso and legs while she was in a seated position. The victim's birthmark and clothed buttocks and genital area could be seen in the photograph. The deleted image did not have any data stored with it.

Furthermore, Sgt. Sheppard located on the phone's "SD card"[5] four "carved raw" images allegedly "of an infant['s] . . . vagina being spread open by an adult female hand." Sgt. Sheppard believed, based upon his familiarity with looking at child pornography as part of his job, that the female infant in the pictures was around six months old. Sgt. Sheppard also found five pictures of an adult male seated on a red chair masturbating. All nine of these pictures had likewise been deleted and did not have any data stored with them.

Sgt. Sheppard confirmed that there were "thousands of pictures" on the Defendant's phone, some of which included family photographs, album art, and electrical photographs. He could only state that the video was modified on November 16, 2013, but he could not provide a date for the video's creation because it had been deleted and there was no data stored with it. Also, he acknowledged that "a regular person" would not be able to recover the deleted images without access to very expensive software.

Sgt. Sheppard also searched the phone's internet history and determined that approximately twelve pornography websites were visited on October 22, 2013. Sgt. Sheppard compiled a list of the websites, including "several that referenced naked red-headed teens[,]" and that list was admitted into evidence. For example, Sgt. Sheppard found a visit to http://www.filmvz.com/naked/naked-redhead-teen-lyte-young-teens.htm, which was accessed twice through an application on the phone called "BaDoink." Sgt. Sheppard explained that the websites were visited only once or twice and only on this solitary day. Additionally, all of the sites were accessed during a twenty-two-minute time period in the morning after 9:00 a.m,[6] according to Sgt. Sheppard.

Furthermore, Sgt. Sheppard testified that a phone's internet history was only "kept in the phone[,]" not on an SD card. Sgt. Sheppard confirmed that a site titled http://thepioneerwoman.com/cooking/2009/08/shortbread-cookies/ was also in the Defendant's internet history, having been visited on December 10, 2013.

Sgt. Sheppard gave the phone's SD card to another technician with ICAC, Shannon Morris. Ofc. Morris's credentials concerned examining "computer hard drives" on "SD cards, digital cameras, cell phones." Ofc. Morris used "EnCase" software to recover the deleted twenty-seven-minute video of the victim's showering. In addition,

---

[5]   Sgt. Sheppard described an SD card as a type of removable memory card suitable for placement inside cell phones. According to Sgt. Sheppard, an individual can expand a phone's memory by installing an "aftermarket" SD card and that was done to the Defendant's phone in this case.

[6]   The Defendant's cell phone stored data using Coordinated Universal Time (UTC), a time standard commonly used across the world. Sgt. Sheppard clarified that Knoxville time was either "[f]our hours [behind] if it's eastern daylight [or] five hours [behind] if it's eastern standard[,]" although he could possibly have had that "backwards" and would have had to double-check to be certain.

Ofc. Morris discovered a second deleted recording made in the home's bathroom. This video was only several seconds long and showed the lower portion of the Defendant's body, dressed in the same clothes as in the first video, and hygiene items were displayed on the bathroom sink. Both videos were played for the jury.

Ofc. Morris confirmed that there was no identifying "metadata on either of those videos[.]" Ofc. Morris also agreed that highly expensive equipment was needed to retrieve the recordings off of the SD card.

According to Ofc. Morris, an individual could change his or her phone's settings to save internet history onto an SD card, but Ofc. Morris did not examine the Defendant's SD card for web history. Ofc. Morris explained that, if you transfer an SD card from one device to another, then "[a]nything that's saved on the SD card" will now be accessible on the new phone, but the data remains on the SD card unless downloaded.

Finally, when asked how "Google Chrome[7] works," if it "allow[ed] [someone] to save web history on one device and then open it up on another device and . . . see the history where [he or she] went[,]" Ofc. Morris responded, "If you're signed in under your Gmail account."[8] Ofc. Morris also agreed that the following scenario was plausible:

> [I]f you have multiple Chrome accounts; like, for instance, I've got a Gmail account and my wife has a Gmail account and I go to ESPN and start looking up sports and on—and I do it on a shared home computer, okay. And say my wife goes and looks at Auburn football . . . , and she looks at it in Google Chrome on her phone

then "that Auburn football search" could "show up in the computer or vice versa[.]" However, Ofc. Morris reiterated that the web history in this case was not obtained from the Defendant's SD card because it was not searched for web history. Ofc. Morris further explained that a phone would store the internet history of the user that was "signed in" or, if no one was signed in, "then it just keeps its own web history in the phone."

B. Victim's testimony. The victim, who was fifteen-years old at the time of trial, identified the Defendant as her step-father and testified that he had lived with the victim and her family since she was one. The victim described the family's house as

---

[7] "Google Chrome is a freeware web browser developed by Google." WIKIPEDIA, https://en.wikipedia.org/wiki/Google_Chrome (last visited on April 6, 2017).

[8] "Gmail is a free, advertising-supported email service developed by Google. Users can access Gmail on the web and through the mobile apps for [cell phones], as well as through third-party programs that synchronize email content[.]" WIKIPEDIA, https://en.wikipedia.org/wiki/Gmail (last visited on April 6, 2017).

approximately eight-hundred square feet in size, with a kitchen, living room, one bathroom, and two bedrooms. The home's only bathroom had a standing shower. There was shelving above the toilet where the camera was hidden, but there was also shelving next to the shower. When the opaque shower curtain was closed, it covered both the shower and the shelving next to it.

According to the victim, she first learned that the Defendant had recorded her showering when she heard her mother and the Defendant in their bedroom arguing about the video one Sunday morning. The victim confirmed that she had previously told her mother that the Defendant was texting another woman and that her mother and the Defendant were also arguing about those text messages in addition to the video. The victim said that the Defendant did not respond when her mother "asked him why he had been videoing [the victim] in the bathroom." However, the Defendant did inquire of her mother how she obtained his phone's passcode, and her mother "said it didn't matter." When the victim went to use the bathroom, she looked into their bedroom and saw the Defendant "on top of" her mother trying to "get the phone" away from her. Because the victim was angry, she went into the bedroom and punched the Defendant. After her mother told her to leave, they shut the door, so the victim could no longer hear what was going on inside.

The victim testified that her mother never called the police or DCS nor did she make the Defendant leave the house. According to the victim, her mother advised her to "not talk about it and that she would help [the victim] get through it and everything would be okay." The victim said that she tried to avoid being at home alone with the Defendant after she heard about the recording.

Additionally, the victim relayed details of another instance when she and her mother discussed the video. The victim was eating alone at a Taco Bell restaurant and her mother called. Her mother "told [the victim] that [she] was being irresponsible by not being with [her] sister and just going off by [her]self[.]" The victim said that she "kind of yelled at her [mother] and told her not to talk about irresponsibility" and then brought up the video. According to the victim, her mother replied "that that was a different story[.]"

The victim estimated that she learned about the video approximately a month and a half before the first day of school, which was August 8, 2014. On that day, the victim was called into her school's office to speak with a DCS case worker and a police officer. After they asked the victim a few questions about her step-father, the victim, at their request, escorted the officers to her mother who was also present at the school. The victim described that, when her mother saw her, she looked "disappointed at [her.]" Thereafter, the victim's grandparents took her to Child Help where she was interviewed.

-10-

The victim identified herself in the three thumbnail images found on the Defendant's phone. However, the victim acknowledged that she frequently went through the Defendant's phone, that she and the Defendant had exchanged SD cards, that she sometimes used his phone to take photographs, and that she might have "look[ed] stuff up on his phone." Furthermore, she confirmed that the family used Google Chrome on their home computer and laptop.

The victim agreed that she frequently took pictures of herself, known as "selfies," and that it was "possible" that she could have used the Defendant's phone to take some of these photographs, although she could not recall any instances specifically. The victim testified that she had taken selfies while in the bathroom and averred that it was "possible" that she took the two pictures of her naked in the bathroom. She explained that she sometimes captured "selfies using a delayed click feature on [her] phone[,]" which allowed her to take pictures from farther away. However, according to the victim, she did not take the picture showing the birthmark on her leg. She proclaimed that she did not give permission for anyone to take pictures of her in the bathroom. Moreover, the victim asserted that she never let the Defendant take photographs of her while she was in a state of undress and that she never purposely let him videotape her without her clothes on. The victim also agreed that the Defendant had never directed her to take selfies.

Regardless, she asserted that she never used the Defendant's phone to take a naked picture of herself and that she had never used his phone to take a selfie in the bathroom. The victim further testified that she did not put the camera in the bathroom to record her while she showered, that she never had any pictures of a baby's vagina, and that she never viewed pornography websites.

C. The Defendant's proof. Shelia Atkins testified on behalf of the Defendant, whom she had previously dated for "quite a while." Although Mrs. Atkins was married with three children, she exchanged sexual text messages with the Defendant prior to June 2014. When the Defendant's wife sent her a text message asking her to stop texting the Defendant, she "respected that and that brought an end to it."

Mrs. Atkins viewed the four images allegedly of a baby's vagina being penetrated by a female hand. She claimed that the pictures were of her genitalia, not a baby's. Moreover, she identified the ring in the images as belonging to her, which was the same ring she was wearing at trial. According to Mrs. Atkins, those pictures "were created spur of the moment without much thought to them." She averred that she sent those images when she and the Defendant were sending text messages back and forth, which was approximately one to two years before the April 2015 trial.

-11-

She was also shown the five photographs of an adult male masturbating. Mrs. Atkins identified the Defendant's penis in the pictures, and she claimed that he sent those images to her at the "exact same time" time she sent the pictures to him of her vagina.

Thomas Ham, a licensed private investigator, went to the Defendant's home and surveyed the home's only bathroom, which he described as "not very big at all" and in "a lot of disrepair . . . from the moisture and the mildew[.]" The bathroom measured approximately five-by-five or six-by-six feet. Mr. Ham understood that the camera in this case was placed on the shelving above the toilet angled "in a downward fashion[.]" Mr. Ham opined that, if someone wanted to voyeuristically look at an individual while showering in that bathroom, then "a much better location" to position the camera would have been on the shelving next to the shower. However, he agreed that, if someone wanted to record the individual outside of the shower, then "where the phone was would have been a better vantage point[.]"

A.G. also testified on behalf of the Defendant at trial, relaying some of the same details from the motion to suppress hearing. Additionally, A.G. stated that the victim had informed her of some suspicious text messages on the Defendant's cell phone possibly indicating that he was having an affair. She found the text messages between Mrs. Atkins and the Defendant on a Sunday morning in June 2014. On that same morning, she also watched the video of the victim's showering recorded on the Defendant's cell phone. According to A.G., the fight the victim witnessed her having with the Defendant over his cell phone involved the text messages, not the video, because she was not upset about the video, she claimed. A.G. said that, when she learned that the Defendant was not having a physical affair, she eventually forgave him.

According to A.G., in the months prior to June 2014, she and the Defendant became "very concerned about activities" of the victim and the victim's older sister, H.T. Specifically, A.G. claimed that she had found some cigarettes in H.T.'s purse. She also thought H.T. was smoking marijuana in the bathroom because H.T. stayed in the bathroom for thirty or forty minutes at a time, A.G. never heard water running or the toilet flush, and H.T. burned incense while in the bathroom. Regarding the victim's behavior, A.G. began to notice "highly inappropriate" text messages on the victim's phone where boys asked for "sexual stuff[.]" A.G. claimed that she saw where the victim had started by sending pictures of herself in her sports bra, eventually progressing to sending "full body nudes to boys." A.G. said that "[a]ll the pictures that [she] had seen on [the victim's] phone" had been taken in the bathroom.

According to A.G., the victim was using an application on her phone called "KIK" that allowed the victim to send pictures and videos of herself to random strangers. When A.G. was finally able to remove the application from the victim's phone, the victim began using "Snapchat" instead. A.G. and the Defendant also found a hidden folder on

the victim's phone that contained a Snapchat photograph of the victim's vagina; they believed that the victim was using Snapchat to circumvent their monitoring of her phone. According to A.G., they spoke with the victim about the picture, and the victim admitted that she took the photograph. They also told the victim that what she was doing was child pornography, which was "just morally . . . wrong[,]" and that the victim "need[ed] to respect [her] body[.]" However, the victim would stop for a little while, but she would always start doing it again, A.G. claimed.

A.G. testified that, in June 2014, they decided to place the cell phone camera in the bathroom for the girls' protection. Although they agreed to record the girls, A.G. did not actually know that the Defendant had made the video until she saw it on his phone. She claimed that their house was crowded and that the Defendant was likely unable to tell her because they lacked privacy. Moreover, A.G. claimed that she did not tell the officers why they made the video when she was interviewed on August 8, 2014, because she had heard "horror stories about DCS" and did not want to say anything "without proper representation[.]" She also acknowledged that the Defendant never gave any explanation to Inv. Johnson about why they made the recording.

While watching the recording, A.G. observed the Defendant's licking his lip while setting up the camera, but she claimed that he licked his lips one "hundred percent of the time" when he performed tasks. A.G. noted that the recording was made from "[t]he high spot in the bathroom looking down towards . . . the sink area" and that you were unable to see the victim "actively taking a shower" from the way the camera was set up. A.G. believed the Defendant had created the video a few days earlier, but she did not think he had seen the video before they spoke about it. According to A.G., she deleted the video "as soon as [she] saw it" because it "didn't show anything." Also, the Defendant frequently left his phone lying around the house, and she knew his passcode; so, she therefore had regular access to the phone.

She did not recall ever asking of the Defendant, "Why are you recording my daughters?" She also did not remember saying to him that "the bathroom is a private place" or describing the video as "disgusting[.]" She claimed that, if the Defendant "was possessing child pornography or . . . videotaping [her] daughter for . . . sexual gratification purposes," then she would have kicked him out of the house and "pursued every single legal means" necessary to keep him away from her children.

A.G. also attempted to explain why the pornographic websites, all accessed on the same day, were found in the Defendant's phone's internet history. According to A.G., based upon a conversation with the victim's ex-boyfriend's mother at a high school football game, she feared that there might have been naked pictures of the victim on those sites. A.G. claimed that, on the morning of October 22, 2013, she used Google Chrome on the family's home laptop computer to search the internet, which web browser, she

claimed, synchronized searches between all "synced devices." A.G. testified that the Defendant's phone was logged into Google Chrome, and it was linked with the family's laptop. She also claimed that she was the one who accessed the Pioneer Woman website, routinely visiting that site because it was one of her favorite cooking shows. Moreover, the album art found on the Defendant's phone was "definitely" not representative of the types of music the Defendant listened to, in A.G.'s opinion. A.G. further claimed that, on one occasion, the victim's phone was overheating where the SD card was, so the victim and the Defendant switched SD cards, which fixed the problem.

When asked details about the Defendant's employment, A.G. testified that the Defendant usually left the home around 7:30 a.m. to go to work and did not return until late in the evening. He also took his phone with him to work, according to A.G. A.G. reiterated that she searched the internet on the morning of October 22, 2013, on the family's laptop, not the Defendant's phone.

A.G. testified at trial about her previous interaction with ICAC several years beforehand. She claimed that the older boy who asked for a nude picture of the victim said he wanted to masturbate to the photograph. A.G. stated that ICAC kept the victim's phone for three weeks but that they never told her the results of any investigation. A.G. did not recall the detective's telling her that there was nothing found on the victim's phone.

The victim had previously accused the Defendant of touching her inappropriately, according to A.G., but A.G. did not believe her. A.G. agreed that she never reported these prior allegations to the authorities, but she clarified that she would do anything to help the victim if she thought someone was really hurting her. A.G. and the Defendant discussed the victim's claim in detail, and the Defendant denied touching the victim and was in "total shock[,]" according to A.G. She did not recall having any conversations with the victim regarding the victim's being afraid to stay at home alone with the Defendant due to his recording of the video.

Furthermore, A.G. stated that the police never served a warrant to search any of the family's home computers. They also never came to the house and performed any investigation.

H.T., who was seventeen years old at the time trial, confirmed that her mother and the Defendant were concerned about her and the victim's activities around June 2014. H.T. said that she was spending long periods of time in the bathroom between April and June 2014 because she was tired and that she could sleep in the bathroom where it was quiet and warm. She denied ever smoking marijuana in the bathroom, although she admitted that was burning incense in the house. H.T. averred that, if the Defendant taped her in the bathroom for "a good reason," then she would understand.

D. <u>Rebuttal</u>.  Dr. Mary Palmer was qualified as an expert in child abuse pediatrics. Dr. Palmer opined that the four images found on the Defendant's phone were of a child's vagina and bottom and were "not pictures of an adult."  She stated that the hand in the picture possibly belonged to a forty-nine-year-old woman, but in her medical opinion, there was "no possibility" that the genitalia and buttocks in the pictures were an adult's. Dr. Palmer did acknowledge that "sometimes photographs can present a different image as to what's really there[.]"

Sgt. Sheppard was recalled.  He testified that, if someone put a different SD card in a cell phone, the web history would not be transferred from the SD card to the phone because web history is "device specific[.]"  According to Sgt. Sheppard, even if an individual was using Google Chrome, the search history of websites would not be transmitted from one device to another.  Furthermore, Sgt. Sheppard explained that several of the websites were accessed through BaDoink, which was a specific application for a mobile Android device, and for that reason, those websites could not have been accessed through a computer or a laptop.

E. <u>Surrebutal</u>.  A.G. again testified, claiming that, as she understood it, when an individual uses Google Chrome, the website history is automatically synchronized across devices.  She stated that, when she used Google Chrome at work, she could later access that same search history on her cell phone or the family's laptop.  According to A.G., she had seen the Defendant's mobile search history show up on the family's home computer before.  A.G. reluctantly agreed that, if the websites were accessed through the BaDoink or "pornsicle" applications, then she was not the one who used those applications.

F. <u>Verdict and Sentence</u>.  Following the presentation of evidence, the Defendant was convicted of one count each of especially aggravated sexual exploitation of a minor, unlawful photography, and observation without consent.  He was found not guilty of all other counts.  Thereafter, the trial court sentenced the Defendant as Range I, standard offender to an effective nine-year incarcerative sentence, imposing a nine-year sentence for the Defendant's especially aggravated sexual exploitation of a minor conviction and concurrent eleven-month-and-twenty-nine-day terms for both misdemeanor convictions.

## ANALYSIS

On appeal, the Defendant argues (1) that the trial court erred when it denied his motion to suppress; (2) that the evidence was insufficient beyond a reasonable doubt to establish sexual activity, an element of his especially aggravated sexual exploitation of a minor conviction; and (3) that the trial court erred by enhancing his Class B felony sentence to nine years.  The State submits that the appeal should be dismissed as untimely, but if not, the State contends that the Defendant is not entitled to any relief.

*I. Timeliness*

Initially, the State argues that the Defendant's notice of appeal document was not timely filed and that the appeal should be dismissed. The Defendant responds that this court should "invalidate[]" the State's waiver argument because the trial court "never reduced its ruling in the form of a written order, upon which [the] Defendant could rely upon to trigger the non-jurisdictional, 30-day appeal period[,]" and because the Knox County Court Clerk "never served notice upon [the] Defendant, or his counsel, that 'entry of judgment' had occurred, as the [m]inutes dated November 12, 2015, do not contain a certificate of service." Otherwise, the Defendant submits that we should waive the timely filing requirement in the interest of justice.

Tennessee Rule of Appellate Procedure 4(a) states that "the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from[.]" Certain post-trial motions, such as a motion for judgment of acquittal or motion for new trial, when timely filed, toll the time for filing the notice of appeal. Upon the filing of a motion for new trial, "the time for appeal for all parties shall run from the entry of the order denying a new trial[.]" Tenn. R. App. P. 4(c). However, this rule also states that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). "In determining whether waiver is appropriate, this court will consider the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular case." State v. Rockwell, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007) (quoting State v. Markettus L. Broyld, No. M2005-00299-CCA-R3-CO, 2005 WL 3543415, at *1 (Tenn. Crim. App. Dec. 27, 2005)). "Waiver is not automatic and should only occur when 'the interest of justice' mandates waiver." Id. (citing Michelle Pierre Hill v. State, No. 01C01-9506-CC-00175, 1996 WL 63950, at *1 (Tenn. Crim. App. Feb. 13, 1996)).

The Defendant's motion for new trial was filed on September 28, 2015, after the trial court entered judgment forms reflecting the sentence imposed. A hearing was held on the Defendant's motion on November 12, 2015. The record does not contain a written order, signed by the trial court, denying the motion for new trial, but its determination is clearly reflected in the transcript of the matter. Additionally, the record contains a November 12, 2015 minute entry indicating that the trial court denied the motion, which is sufficient to confer jurisdiction of the Defendant's case to this court. See State v. Byington, 284 S.W.3d 220, 226 (Tenn. 2009) ("[A]lthough we hold that a minute entry is sufficient to confer appellate jurisdiction under Rule 4 in a criminal case, better practice dictates that the trial court enter a written order." (emphasis added)). Therefore, the Defendant had thirty days after November 12, 2015, to file his notice of appeal. See id.

However, the Defendant's notice of appeal was not filed until December 17, 2015, three days late. See Tenn. R. Crim. P. 45(a) (instructing on time computation). Given the short amount of time the Defendant's notice of appeal document was late, the fact that the trial court never entered a written order denying the Defendant's motion for new trial, and the nature of the issues presented for review, we opt to waive the untimeliness of the notice of appeal document in the interest of justice. Accordingly, we will address the Defendant's issues.

## II. Motion to Suppress

On appeal, the Defendant challenges his consent to search his cell phone on two grounds: (1) whether his consent given to Inv. Johnson was voluntary, within which he incorporates a challenge to the initial seizure of his cell phone; and (2) whether the State exceeded the scope of his consent. Before beginning, we must note that the Defendant's arguments surrounding the voluntariness of his consent, the scope of that consent, and the initial seizure of the cell phone are extremely comingled and disjointed, leading to a great deal of unwarranted explanation in this opinion.

A. Voluntariness of the Defendant's Consent and Warrantless Seizure. Regarding his first issue, the Defendant submits that the trial court erred by denying his motion to suppress the evidence because his consent to search his cell phone was involuntary given to Inv. Johnson. Specifically, he notes that Inv. Johnson forcibly seized the cell phone from his hand, that Inv. Johnson threatened to get a warrant if he did not consent, and that Inv. Johnson promised that signing the consent to search form would expedite the process of getting his children back. The State preliminarily argues that the Defendant has waived this issue by failing to raise it in his motion for new trial. Subsequently, the State contends that the trial court correctly ruled that the Defendant gave voluntary consent to search his phone. Focusing on the totality of the circumstances, the State points to the facts that Inv. Johnson asked the Defendant for consent to search his cell phone, that Inv. Johnson then left and allowed the Defendant five to ten minutes to think about it, and that the Defendant "pretty quickly" offered his consent when Inv. Johnson returned.

As an opening matter, we must address the State's argument that the Defendant has waived review of this issue because he did not raise it in his motion for new trial. In the Defendant's motion for new trial, he set forth his suppression issue as follows:

> The [c]ourt erred in failing to suppress the evidence obtained by the Knoxville Police Department from [the Defendant's] "smartphone," i.e. the deleted video and other pictures and documents that were subsequently admitted into evidence by the State in an effort to convict [the Defendant]. All of the evidence presented to the jury, which was obtained from [the Defendant's] cell phone, had been previously deleted. The consent form

admitted into evidence at the suppression hearing and admitted into evidence at trial as Exhibit 1, did not provide sufficient consent to allow the Knoxville Police Department to search for <u>deleted</u> files on [the Defendant's] smartphone.

The State contends that, "[f]rom a reading of this issue, the [D]efendant alleged that the police exceeded the scope of the [D]efendant's consent to search his phone when they went into deleted files[,]" which is the Defendant's second issue presented on appeal. Accordingly, because a challenge to the voluntariness of the Defendant's consent was not raised in the motion for new trial, the issue is waived on appeal, in the State's opinion. The Defendant responds that the issue of his voluntary consent was "sufficiently raised and argued" in the motion for new trial. He also submits that Tennessee Rule of Appellate Procedure 3(e) is inapplicable here because a motion to suppress is a pretrial issue not an issue regarding the admission or exclusion of evidence that occurred "during the trial of the case." He explains,

> It defies logic to require a [d]efendant to re-raise an issue raised in a [m]otion to [s]uppress in a [m]otion for [n]ew [t]rial, because re-trying a case without any evidence to present is an impossible task. . . . The State in this case could have never proven any [c]ounts of the [p]resentment that resulted in guilty verdicts without introducing the recovered, deleted cell phone video evidence.

> Tennessee Rule of Appellate Procedure 3(e) states that

> no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived.

First, we disagree with the Defendant that Rule 3(e) does not apply in this instance and that pretrial suppression issues are not required to be re-raised in a motion for new trial.

For example, in <u>State v. Ronnie Watson</u>, this court concluded that the defendant's suppression issue was waived because it was not included in the motion for new trial. No. W2001-03084-CCA-R3-CD, 2002 WL 31258011, at *1 (Tenn. Crim. App. Sept. 16, 2002). In <u>Watson</u>, the Defendant was questioned in jail following his arrest. He gave both a handwritten statement and a recorded statement, admitting that he had committed the aggravated robbery, and claiming that he did so to obtain money for his crack cocaine addiction. After criminal proceedings were initiated, the defendant filed a motion to

suppress his statements, arguing at the suppression hearing that he did not knowingly, voluntarily, or intelligently waive his constitutional rights prior to giving the statements. The trial court rejected the defendant's factual proof and ruled that the statements were admissible. The defendant was thereafter convicted by a jury of his peers, and his motion for new trial was denied. He claimed on appeal to this court that the trial court erred in its ruling that his confessory statements were admissible. However, we waived any consideration of the issue, citing Tennessee Rule of Appellate Procedure 3(e), because the defendant had not included the suppression issue in his motion for new trial. Id. at *1. The same is true in our Defendant's case: he was required to raise the suppression issue in his motion for new trial. See, e.g., State v. Damien O. Armstrong, No. W2012-02531-CCA-R3-CD, 2014 WL 576406, at *1 (Tenn. Crim. App. Feb. 12, 2014) (requiring issue—that trial court erred in denying motion to suppress search warrant as defective because the magistrate did not endorse the name of the executing officer—to be raised in motion for new trial); State v. Tommy Pleas Arwood, Jr., No. M2003-01125-CCA-R3-CD, 2007 WL 1890100, at *8 (Tenn. Crim. App. June 28, 2007) (necessitating defendant's issue challenging trial court's denial of motion to suppress the evidence obtained from search of defendant's car to be included in motion for new trial).

Having established that Rule 3(e) applies, we must next determine if the Defendant raised the issue in his motion for new trial with enough specificity to preserve it for appellate review. Tennessee Rule of Appellate Procedure 3(e) requires that issues presented in the motion for new trial be "specified with reasonable certainty so as to enable appellate courts to ascertain whether the issue was first presented for correction in the trial court." Waters v. Coker, 229 S.W.3d 682, 689 (Tenn. 2007) (citing State v. Gauldin, 737 S.W.2d 795, 798 (Tenn. Crim. App. 1987)); see also State v. Petr Pompa, No. M2016-00193-CCA-R3-CD, 2017 WL 1014529, at *8 (Tenn. Crim. App. Mar. 15, 2017); State v. Mashaal Arradi, No. M2013-00613-CCA-R3-CD, 2014 WL 891536, at *4 (Tenn. Crim. App. Mar. 7, 2014). "[A]ppellate courts should review a motion for new trial in the light most likely to preserve the issue alleged, although courts cannot create an error where none has been legitimately preserved." Fahey v. Eldridge, 46 S.W.3d 138, 146 (Tenn. 2001); Pompa, 2017 WL 1014529, at *8; Arradi, 2014 WL 891536, at *4.

The Tennessee Supreme Court has explained,

Before an issue can be properly preserved in a motion for new trial under Rule 3(e), a well-pleaded motion should (1) allege a sufficient factual basis for the error by setting forth the specific circumstances giving rise to the alleged error; and (2) allege a sufficient legal basis for the error by identifying the trial court's claimed legal basis for its actions and some articulation of why the court erred in taking such actions.

-19-

Fahey, 46 S.W.3d at 146. The first two sentences of the Defendant's issue sets forth a factual basis for the error by identifying the trial court's failure to suppress the "deleted video and other pictures and documents" obtained from the Defendant's cell phone and that those items were the substance of the State's evidence used against him at trial. However, this is nothing more than a general proposition that the trial court erred at the suppression hearing. The motion does not provide the legal grounds relied upon by the trial court in denying the Defendant's motion to suppress, which was that the Defendant's consent was voluntarily given to Inv. Johnson. The last sentence of the Defendant's motion for new trial issue postulates that the court's ruling was improper because the scope of the search, which included a search of the Defendant's cell phone's deleted files, exceeded his consent. Moreover, all argument presented by the defense at the motion for new trial hearing concerned the scope of the Defendant's consent, and defense counsel did not attempt to advance any argument regarding the voluntariness of the Defendant's consent given to Inv. Johnson. This court "will not find an error, even under a liberal interpretation of the motion, where no error has actually been alleged[.]" Id. at 146.

In light of the foregoing, we deduce that the specific suppression issue presented in the Defendant's motion for new trial was whether the trial court erred by allowing the deleted videos and images into evidence because the police exceeded the scope of the Defendant's written consent, not whether he voluntarily gave that consent. Accordingly, we agree with the State that the Defendant's issue regarding whether he voluntarily consented to a search of his cell phone was not properly set forth in the motion for new trial with enough specificity to preserve it for appeal under Rule 3(e). See, e.g., Fahey, 46 S.W.3d at 146 (waiving defendant's suppression issue because motion for new trial did not "assert the legal grounds relied upon by the [trial] court for excluding the expert" or "set forth any legal ground identifying why the court's exclusion was improper"); Arradi, 2014 WL 891536, at *4 (finding waiver where suppression issue failed "to identify any legal ground supporting the conclusion that the admission of the testimony was improper," and "[t]he general statement regarding the 'speculative testimony' provided little guidance to the trial court as to the error alleged, and certainly failed to put the court on notice of claims regarding expert testimony").

Alternatively, the Defendant submits in his reply brief that, if he has waived the issue, this court should review the issue for plain error. The plain error doctrine states that, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a

substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

The Defendant's appellate issue on the subject of the voluntariness of his consent is framed as follows:

The trial court erred in denying the motion to suppress by ruling that [the Defendant] freely and voluntarily consented to a search of his cell phone, after the police investigator forcibly seized the cell phone from [the Defendant's] hand and promised that by signing the consent to search form it would expedite the process of getting his children back.

The Defendant's argument for plain error in his reply brief focuses on Inv. Johnson's initial warrantless seizure of the Defendant's cell phone prior to either the Defendant's verbal and written consent. Specifically, he makes the following statements:

(1) "Whether it was five, ten, or [thirty] minutes, once the State illegally seizes private property in violation of protections against illegal seizure, this taint prevents the State from obtaining valid consent to search the same illegally seized property from a suspect.";

(2) "[The Defendant's] state of mind is irrelevant, because no suspect could ever consent to a search after an illegal, tainted, warrantless seizure.";

(3) "The State's brief does not argue that [the Defendant] gave consent to have his cell phone seized or that he voluntary delivered the cell phone to Inv[.] Johnson. The record is clear that [the Defendant] did not voluntarily cooperate to allow Inv[.] Johnson to seize his cell phone."; and

(4) "While the State's brief provides an accurate analysis of the consent to search doctrine in Tennessee, and under the Federal Constitution, it fails to address the white elephant in the room, namely, that [the Defendant]

-21-

suffered an illegal seizure of his cell phone to which he did not consent, and to which he objected by asking for return of his cell phone."

Despite these statements, defense counsel conceded at the suppression hearing that, because the phone was suspected to contain "contraband," it was subject to seizure. This conclusion is supported by the following dialogue between defense counsel and the trial court at the suppression hearing:

[DEFENSE COUNSEL]:  Well, if [Inv. Johnson] could tell it was a Galaxy S4 when he grabbed it out of [the Defendant's] hand.  I mean, [Inv. Johnson] knew that it was on potentially [the Defendant's] phone.  I don't know whether or not you could find that this was—that [Inv. Johnson] had actual knowledge that it was that phone.  [Inv. Johnson] just saw [the Defendant] pull it out of his overall bibs, and he saw him take the phone.

THE COURT:  Okay.  Assuming that the officer had knowledge that there was child pornography or an image of a naked [fourteen-]year-old on a phone possessed by [the Defendant], could he or could he not take that phone in the way that he did?

[DEFENSE COUNSEL]:  Well, Your Honor, I believe under Riley [v. California,] he still has to have consent or he has to have a warrant.  I don't know that you can just seize it and then search it without consent.  And they—and the problem with the case is that they said to expedite getting your kids back, you're going to have to sign this—

THE COURT:  That's two separate questions.  The question right now is could the officer take the phone from [the Defendant] in the manner that he took it?  And if he couldn't, what harm—what constitutional harm are we addressing at this time?

[DEFENSE COUNSEL]:  Well, constitutionally it was the taking, he asked for it back.  They didn't get it back.

THE COURT:  But my question is if the officer had information that a phone possessed by [the Defendant] had the image of a [fourteen-]year-old naked girl, could he take that phone?

[DEFENSE COUNSEL]:  I think I would have to concede yes on that.[9]

THE COURT:  All right.  Because it's contraband, is it not?

[DEFENSE COUNSEL]: That's correct.

THE COURT:  All right.  So from that point if he could legally—if he had that information, take that phone, is the question then whether or not this was a valid consent, is that what we're down to?  Whether or not this— looking in the phone was—that they validly and constitutionally consented to do that, correct?

[DEFENSE COUNSEL]:  Yes, Your Honor, I think that's the correct analysis.

Accordingly, the only contested issue presented at the suppression hearing was whether the Defendant's consent to search the cell phone was voluntarily given and not whether an improper seizure occurred.

In Riley v. California, the United States Supreme Court held that officers are permitted to seize and secure a cell phone to prevent the destruction of evidence but that they are required to obtain a warrant before searching the contents of the phone.  --- U.S. ---, 134 S.Ct. 2473, 2486, 2493 (2014); see United States v. Conlan, 786 F.3d 380, 388- 89 (5th Cir. 2015) (concluding that seizure of defendant's cell phone and laptop, which were lying on motel bed, was proper under plain view doctrine where officers were lawfully in area where items could be plainly viewed; incriminating nature of items was immediately apparent, meaning that officers had probable cause to believe that items were either evidence of a crime or contraband; and officers had lawful access to items). Also, the search of the cell phone in Riley was a warrantless search incident to arrest whereas the search in this case was authorized by the Defendant's consent, a separate and distinguishable exception to the warrant requirement.   See 134 S.Ct. at 2482 ("In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement.") (citing Kentucky v. King, 563 U.S. 452, 459-62 (2011))); see also State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) ("Exceptions to the warrant requirement include searches incident to arrest, plain view, exigent circumstances, and

---

[9]  On appeal, defense counsel submits that he did not make such a concession at the motion to suppress hearing.  Specifically, defense counsel notes, "The State seems to argue that the Defendant conceded that Inv[.] Johnson knew that the exact black Galaxy cell phone contained 'contraband,'" and then cites to the portion of his argument at the suppression hearing that Inv. Johnson knew the video was "potentially" on the Defendant's phone but that he lacked "actual knowledge" of that fact at time the phone was seized. While defense counsel did present this argument at the suppression hearing, we cannot ignore the rest of the colloquy that ensued.

others, such as the consent to search.") (citing State v. Cox, 171 S.W.3d 174, 179 (Tenn. 2005))). See, e.g., State v. Cuben T. Lagrone, No. E2014-02402-CCA-R3-CD, 2016 WL 5667514, at *15 (Tenn. Crim. App. Sept. 30, 2016) (concluding that cell phone was lawfully searched pursuant to defendant's consent which he gave to investigator), perm. app. denied (Tenn. Feb. 15, 2017). We agree with defense counsel's concession at the suppression hearing because, in an effort to prevent the destruction of evidence, the initial seizure of the Defendant's cell phone by Inv. Johnson was constitutionally allowable.

On the other hand, the Defendant asserts that his consent to search was involuntary because Inv. Johnson threatened to get a warrant if the Defendant did not consent and because Inv. Johnson promised that signing the consent to search form would expedite the process of getting the Defendant's children back. At the conclusion of the suppression hearing, the trial court ruled that there was a valid consent form signed by the Defendant, which was witnessed by his wife. In so deciding, the trial court referred to an audio recording of the interaction between the Defendant, his wife, and Inv. Johnson and found that there was no evidence of "any coercive environment there." That recording was marked for identification but never entered as an exhibit. Because neither the audio recording nor a transcript of that recording is included in the record on appeal, the first factor for plain error review, that the record must clearly establish what occurred in the trial court, is not met. Accordingly, the Defendant is not entitled to plain error relief on the issue of the voluntariness of his consent given to Inv. Johnson.

B. Scope of the Defendant's consent. The only issue properly reserved for appeal under Rule 3(e) is the Defendant's second issue, that "the police investigators exceeded the scope of the specified limits of the written consent, which did not disclose the use of sophisticated equipment, after forensically recovering deleted files." However, as we have detailed above, this issue was not argued at the motion to suppress hearing. At trial, when Sgt. Sheppard began to testify about the web history on the Defendant's phone, defense counsel objected, arguing that "[i]t was clearly not part of his consent." The prosecutor said, "I think that's a pretrial issue that was never raised." The trial court asked, "Didn't we cross that bridge earlier in the suppression hearing?" Defense counsel responded, "Well, we didn't specifically address web history, but the consent was only limited to what it's limited to." The trial court reiterated, "But was there not a separate suppression hearing[?]"; to which both lawyers interjected their agreement that one took place. The trial court continued, "[W]here the [c]ourt ruled, and if I'm wrong, I'm wrong, but I think the [c]ourt has ruled already that the contents of that phone [are admissible]." That ended the discussion on the topic at trial.

Later, the trial court, at the motion for new trial hearing, asked defense counsel if the scope of the Defendant's consent was an issue raised at the suppression hearing, and defense counsel said that he could not recall "exactly" but maintained that he argued "it

was not effective consent." The trial court agreed that the "effectiveness" of the Defendant's consent was argued as an issue but clarified, "I guess what I'm asking, would this not be a scope—the scope of consent argument?" Defense counsel responded that the scope of the Defendant's consent was "properly raised" because he asked Inv. Johnson about it at trial and because "the Court of Criminal Appeals can still consider evidence at trial as it goes to suppression issues." The trial court said, "Sure."

Defense counsel did not attempt to clarify the issue any further and continued with his argument:

> And the officer testified that was not in this form [the word deleted] and I know that other departments do use the word "deleted." KPD does not. Perhaps they will from here on out, but they didn't in this case. And the argument is if he thought it was deleted, then he is consenting to what's there. It took a twenty thousand dollar machine and somebody with expertise to pull these deleted files off of his phone or SD card or wherever it was.

The trial court then read from the Defendant's signed consent form:

> Here's what the consent form says: I, Robert Alexander Grisham, having been informed of my [c]onstitutional right not to have a search made of my cell phone hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, herby authorize Investigator Johnson at the KPD ICAC Unit, officers of the Knoxville Police Department to conduct a complete search of my cell phone, make Galaxy, and gives a password, model, cell phone number, gives the number, serial number, provides that, cell phone provider US Cellular. These officers are authorized by me to secure phone call history, phone contact list, photos, videos and text messages contained on my phone.

The trial court inquired, "Does the [phrase] 'complete search of my phone' not encompass" deleted files? Ultimately, the trial court concluded, "I'm comfortable that the consent issue was properly ruled upon." The trial court also stated, "I'm comfortable that the [Defendant] consented and I'm comfortable that the [c]ourt properly ruled on the suppression question."

A motion to suppress evidence must be made before trial. Tenn. R. Crim. P. 12(b)(2)(C). "The failure to file a pretrial motion to suppress constitutes a waiver unless good cause for the failure to raise the matter pretrial is timely shown." State v. Zyla, 628 S.W.2d 39, 41 (Tenn. Crim. App. 1981); see Tenn. R. Crim. P. 12(f). While the defense asked the witnesses about the nature of the Defendant's consent and the circumstances of

that consent, it was never specifically argued at the motion to suppress hearing that the police unlawfully exceeded the scope of the Defendant's consent. Defense counsel's averment that he presented the issue of "effective consent" at the suppression hearing did not somehow encompass argument on every conceivable nuance of the consent issue. An argument that evidence from the Defendant's phone should have been suppressed because the police exceeded the scope of his consent is not the same as a claim that the Defendant's consent was involuntarily given. Therefore, the proper course would have been for the Defendant to challenge the scope of his consent in a pretrial motion to suppress.

Moreover, the Defendant makes no argument that this court should review this ground for plain error, and we see no reason to do so sua sponte. The Defendant was aware that the police were looking for a video of the victim's showering on his cell phone, and the consent form the Defendant signed referenced a "complete search" of that phone. The Defendant's wife acknowledged at the motion to suppress hearing that they "figured it was possible [the video] could be recovered." Accordingly, appellate review is waived. See State v. John Burley Alberts, No. M2015-00248-CCA-R3-CD, 2016 WL 349913, at *8 (Tenn. Crim. App. Jan. 28, 2016), perm. app. denied (Tenn. June 23, 2016) (holding that defendant's argument that evidence from a laptop should have been suppressed as fruit of the poisonous tree was not the same as claim that search warrant should have been obtained after the laptop was seized but before a forensic analysis was conducted, and therefore, defendant's additional issue which was not presented in a motion to suppress was waived on appeal).

## II. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence supporting his conviction for especially aggravated sexual exploitation of a minor.[10] The crux of the Defendant's argument is that the depiction in the video is legally insufficient to support a finding that the victim was engaged in a "sexual activity" by "lascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area," a required element of the offense. The State insists that the evidence was sufficient to support the conviction because of the angle of the camera; the Defendant's licking of his lips; the visibility of the victim's breast, buttocks, and genitals; and the Defendant's immediate retrieval of the camera after the victim left the bathroom. Alternatively, the State argues that this court should "automatically enter a conviction on the lesser-included offense" of attempted especially aggravated sexual exploitation of a minor, the evidence being sufficient to support it.

---

[10] The Defendant does not challenge the sufficiency of the evidence supporting his misdemeanor convictions on appeal.

-26-

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Id.</u>; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." <u>Id.</u> (quoting <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." <u>State v. Sisk</u>, 343 S.W.3d 60, 67 (Tenn. 2011).

The offense at issue in this case is the production of child pornography, charged as "especially aggravated sexual exploitation of a minor," a Class B felony. Tenn. Code Ann. § 39-17-1005. The crime is defined as follows: "It is unlawful for a person to knowingly promote, employ, use, assist, transport or permit a minor to participate in the performance of, or in the production of, acts or material that includes the minor engaging in: (1) Sexual activity; or (2) Simulated sexual activity that is patently offensive." Tenn. Code Ann. § 39-17-1005(a). Additionally, the term "sexual activity" means any of the following actions:

> (A) Vaginal, anal or oral intercourse, whether done with another person or an animal;
>
> (B) Masturbation, whether done alone or with another human or an animal;
>
> (C) Patently offensive, as determined by contemporary community standards, physical contact with or touching of a person's clothed or unclothed genitals, pubic area, buttocks or breasts in an act of apparent sexual stimulation or sexual abuse;

-27-

(D) Sadomasochistic abuse, including flagellation, torture, physical restraint, domination or subordination by or upon a person for the purpose of sexual gratification of any person;

(E) The insertion of any part of a person's body or of any object into another person's anus or vagina, except when done as part of a recognized medical procedure by a licensed professional;

(F) Patently offensive, as determined by contemporary community standards, conduct, representations, depictions or descriptions of excretory functions; or

(G) Lascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area of any person.

Tenn. Code Ann. § 39-17-1002(8). In this case, the focus is on subsection (G).[11]

Our supreme court has recently held "that appellate review of a lasciviousness determination in child sexual exploitation cases is review of a mixed question of fact and law." State v. Whited, 506 S.W.3d 416, 427 (Tenn. 2016) ("Whited II").[12] The appellate court must review the finding by the trier of fact that the depiction is a lascivious exhibition, including underlying factual issues such as the extent to which the minor appears nude or whether the minor appears to be portrayed in a sexually suggestive manner. Id. (citing United States v. Rayl, 270 F.3d 709, 714 (8th Cir. 2001)). In addition, looking at the evidence in a light most favorable to the verdict, the appellate court must determine whether the depiction is legally sufficient to constitute a "lascivious exhibition" within the meaning of the statute. Id. The latter determination is a question of law subject to plenary review. Id. (citing Rayl, 270 F.3d at 714).

In Whited, the defendant recorded his twelve-year-old daughter and her teenage friend while they were in various stages of undress, showing their private body areas, including bare breasts, buttocks, and pubic areas. Whited II, 506 S.W.3d at 446. The Tennessee Supreme Court held that the defendant's multiple convictions for especially

---

[11] At oral argument on this case, the assistant attorney general argued that subsection (F) also applied because the video depicted the victim's using the bathroom. However, the first part of this subsection requires the depictions or descriptions of excretory functions to be "patently offensive." Nothing about the victim's sitting on the toilet going to the bathroom, when only the back of her head can be seen, is patently offensive. Moreover, although this subsection was included in the jury instructions, the State never relied at trial on this premise to support the statutory element of sexual activity.

[12] The Whited II decision was released in November 2016, after both parties had filed their briefs in this matter.

aggravated sexual exploitation of a minor were not supported by sufficient evidence because the nine hidden-camera videos did not include "sexual activity," defined as the lascivious exhibition of the minors' private body areas. Id. at 446-47. Rather, the minors in the videos were engaging in everyday activities that were appropriate for the settings and were not sexual or lascivious within the ordinary meaning of those terms. Id. at 447. Ultimately, the Whited II court reversed and dismissed the defendant's nine convictions for especially aggravated sexual exploitation of a minor, but upon remand, the State was permitted to try the defendant on the lesser-included offense of attempt. Id. at 447-48.

Prior to the issuance of the Whited II opinion, this court, in a divided opinion, had affirmed Whited's especially aggravated sexual exploitation convictions and sentence. See State v. Thomas William Whited, No. E2013-02523-CCA-R3-CD, 2015 WL 2097843, at *1, 13 (Tenn. Crim. App. May 4, 2015), perm. app. granted (Tenn. Sept. 22, 2015) (McMullen, J., dissenting) ("Whited I"). In concluding that the evidence was sufficient to support the defendant's nine convictions for production of child pornography because "the jury could reasonably infer that [the defendant] created the recordings to elicit a sexual response in himself or a like-minded pedophile[,]" this court relied on the six specific factors set forth in United States v. Dost, 636 F.Supp. 828, 832 (S.D. Cal. 1986) ("Dost factors"), as guidelines for determining whether the hidden-camera videos contained sexual activity or lascivious exhibition of the minors' private body areas. Id. at *8. Other panels of this court had also utilized the Dost factors to determine whether a visual depiction of a minor constituted "sexual activity." See State v. John Michael Whitlock, No. E2010-00602-CCA-R3-CD, 2011 WL 2184966, at *7 (Tenn. Crim. App. June 6, 2011); State v. Gary Stephen Mayes, No. E2004-02344-CCA-R3-CD, 2005 WL 2416620, at *10 (Tenn. Crim. App. Oct. 3, 2005); State v. Larry Dixon, No. 01C01-9802-CC-00085, 1998 WL 712344, at *2 (Tenn. Crim. App. Oct. 13, 1998). However, our supreme court in Whited II, after a lengthy discussion on the unworkability of the Dost factors, specifically instructed lower courts, including ours, to refrain from using those factors as a test or an analytical framework for determining whether material is prohibited under the child sexual exploitation statutes.[13] 506 S.W.3d at 438.

Furthermore, in Whited II, the court held that "the offense of especially aggravated sexual exploitation of a minor does not include as an element of the offense the accused's intent or purpose of sexual arousal or gratification." Id. at 441. The court continued,

In addition, . . . because Tennessee's child sexual exploitation statutes define the prohibited material in the same way regardless of whether the

---

[13] Both the State and the Defendant make their arguments in the context of the Dost factors, focusing particularly on whether the material was intended or designed to elicit a sexual response. The trial court also discussed these factors in ruling on the Defendant's motion for judgment of acquittal.

-29-

defendant is accused of production, distribution, or mere possession, we <u>look at the depiction of the child</u> to determine whether that material would be deemed prohibited if the accused merely possessed it and <u>we knew nothing about the circumstances of its making</u>.

<u>Id.</u> (Emphases added).

We now consider the video at issue in this appeal to determine whether it contains sufficient evidence of a depiction that includes a minor engaged in "sexual activity," defined as the "[l]ascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area of any person." Tenn. Code Ann. §§ 39-17-1005(a)(1), -1002(8)(G). The term "lascivious exhibition" is not defined in the statute. "Black's Law Dictionary defines lascivious as 'tending to excite lust; lewd; indecent; obscene.'"[14] <u>Whitlock</u>, 2011 WL 2184966, at *3 (quoting <u>Black's Law Dictionary</u> 897 (8th ed. 2004)). "Lewd" and "lascivious" are synonyms; both have a sexual connotation. <u>Whited II</u>, 506 S.W.3d at 430-31 (citations omitted). "While defining the term 'lascivious' in the abstract is fairly straightforward, determining whether certain material depicts a minor engaging in the lascivious exhibition of their private body areas within the meaning of the sexual exploitation statutes is another matter." <u>Id.</u> at 431. It is "an intensely fact-bound question" to be determined on a case-by-case basis. <u>Id.</u> (quoting <u>United States v. Schuster</u>, 706 F.3d 800, 806 (7th Cir. 2013) and citing <u>Dost</u>, 636 F.Supp. at 832).

Here, much of the analysis was undertaken by the trial court. After the jury's verdict, the trial court had the parties brief the issue of whether the video constituted "lascivious exhibition." In so instructing the State and the Defendant, the trial court stated its uncertainty about the matter and that it was "toying with the idea that" this was a case of attempted aggravated sexual exploitation of a minor. The trial court further commented that it was "one hundred percent confident and comfortable that there clearly was an attempt proven in this case." Also, in denying the Defendant's motion for judgment of acquittal, the trial court commented,

I have no trouble at all at this juncture saying that there has been an attempt because I think the clear intent of putting that camera up there was to capture a video and stills for [the Defendant's] own devices and purposes hoping that he would see whatever he thought he might be able to see.

This topic was further discussed at the outset of the Defendant's sentencing hearing. Between the Defendant's trial and the sentencing hearing, the <u>Whited I</u> opinion had been issued by a panel of this court. Analyzing the <u>Whited I</u> opinion, the trial court commented that the facts of that case "were almost identical to what was proven in this

---

[14] This definition was given in the jury charge in this case.

case" and that "the facts in this case could not be more on all fours."[15]  Then, "given the current state of law" following Whited I, the trial court concluded that facts in this case met the definition of lascivious exhibition.  However, the trial court also remarked that it found "analysis done by the dissent" in Whited I "to be very noteworthy[.]"

We agree with the trial court that the facts of both cases are strikingly similar.  A detailed summation of the facts our supreme court thought were particularly relevant is, therefore, necessary.  Of the nine videos in that case, six were taken in the bathroom, and three were taken in the daughter's bedroom.  Whited II, 506 S.W.3d at 442.

> For most of the videos, the defendant can be seen at the beginning setting up the hidden cell phone camera, stepping back to ensure that it was positioned the way he wanted, re-positioning it if needed, and then leaving before Daughter entered the room.  When the activity ceases and the victims exit, the defendant's hand can sometimes be seen snatching up the cell phone.  From viewing the videos, it is apparent that neither Daughter nor Friend was aware that they were being recorded.
>
> For each of the bathroom videos, Daughter entered for the obvious purpose of taking a shower.  The defendant hid the cell phone in a basket under the bathroom mirror, with the camera aimed slightly upward, apparently to capture onscreen as much of Daughter's body as possible as she entered and exited the shower.  As noted above, the shower curtain is opaque, so Daughter could not be seen while showering.  In these bathroom videos, Daughter is at times seen fully nude, from the back, from the front, and in profile.  Her bare breasts, buttocks, and pubic area are intermittently visible as she turns on the shower, enters and exits the shower, and generally moves about doing grooming tasks such as drying her body, putting on lotion, and towel-drying her hair.  Daughter plays music in some of the bathroom videos, and, in one, she is seen shimmying to beat of the music as she sings along while still undressed.
>
> For the three bedroom videos, Daughter and Friend (or Daughter alone) entered the bedroom in their bikini swimsuits, apparently after swimming, and changed into dry clothes.  For one of the bedroom videos, the defendant can be seen joking around with the two girls after they enter the bedroom; Daughter says, "Dad, will you get out?!"  He left before they changed clothes.  In the bedroom videos, the cell phone is hidden low, near or at the floor, with the camera aimed upward at the area beside Daughter's

---

[15]  At the motion for new trial hearing, the trial court made additional comments that these two cases had "remarkable similarities" in their facts and that there was "overwhelming proof to support an attempt[.]"

bed, again with the center of the camera view at approximately the center of the girls' bodies. During the clothes-changing process, the girls are shown with their back or side facing the hidden camera; breasts, bare buttocks, and pubic regions are intermittently visible.

Id.

The State attempted to distinguish this case by suggesting at oral argument that the Defendant's licking his lips in "a sexually suggestive manner" while setting up the hidden-camera suggests voyeuristic pleasure, which sexualizes the video. Once more, a similar argument was made in Whited. Indeed, in Whited I, the majority, in affirming the sufficiency of the evidence, placed significance on the fact that the defendant changed the position of the camera:

> The bathroom videos were recorded by a camera that was hidden in a basket on the bathroom sink, which was at waist level. The videos depicted the victim fully nude as she entered and exited the shower and particularly captured her breasts as she stood in front of the sink, only inches away from the camera. The defendant re-positioned the camera to record different areas of the shower, leading to the reasonable inference that he adjusted the camera to better capture longer and better quality videos of the victim's breasts and genitalia. Similarly, the camera in the bedroom videos was specifically placed so that the buttocks and breasts of the victims were in the center of the screen when the victims stood in the center of the room. Although there are times during the recordings where the victims are not in the frame, this does not offset the portions of the recordings where the positioning and framing of the camera resulted in a focus on the victims' breasts and genitalia.

2015 WL 2097843, at *8.

However, our supreme court rejected this rationalization on appeal. Whited II, 506 S.W.3d at 446. In discussing the State's argument "that the voyeuristic perspective of the videos 'sexualizes' nude images of everyday activities that might otherwise be held 'mere nudity[,]'" the Whited II court made the following observations:

> We agree with the State that the actions of persons other than the minor victim who appear in video or images can affect the perception of whether the exhibition of the minor's private body areas is "lascivious." See United States v. Ward, 686 F.3d 879, 883 (8th Cir. 2012) (upholding conviction based on hidden-camera video when the defendant appears in the video positioning the victim or directing her to orient herself for the

camera). Here, the depiction of the defendant setting up the hidden camera portrays voyeurism and suggests a sexual connotation for the minor's engagement in everyday activities ordinarily done in the nude and in private. Imagining a continuum, ranging from innocuous video of a fully clothed child all the way to explicit, hard-core pornographic images of a minor victim, these onscreen images of the defendant move the perception somewhat further along the continuum in the direction of lasciviousness.

However, if the nude videos of the victim, coupled only with the depiction of the defendant hiding the camera, were deemed prohibited material under the child sexual exploitation statutes, it would be difficult to distinguish the offense of production of child pornography from the lesser offenses that essentially criminalize voyeurism, i.e., observation without consent and photography without consent. So while we consider the defendant's appearance in the videos to be relevant, it does not, in and of itself, turn the videos into depictions of a minor engaging in a lascivious exhibition.

Id. at 446-47.

In the present case, the Defendant could be seen in the video setting up the cell phone hidden-camera over the toilet, angling it in a downward direction. He urinated before leaving the bathroom. While standing in front of the toilet, he lifted his shirt and very briefly scratched his chest, including his nipples. Immediately after the victim showered and exited the bathroom, the Defendant returned to the bathroom to retrieve the cell phone. While the Defendant did lick his lips moving his tongue back and forth in the video, nothing about his countenance in so doing was sexually suggestive. The Defendant's wife testified that the Defendant licked his lips regularly while involved in all kinds of tasks, including the mundane. We cannot conclude that this simple act had a sexual connotation absent more.

Moreover, in concluding that the depictions of the minor victims in the Whited case were not lascivious in nature, our supreme court found the following factors persuasive:

These include the level and nature of the nudity in the videos, the emphasis on the minor victims' private body areas, the fact that the victims were engaged in everyday activities ordinarily performed nude, the defendant's audible comments and interactions with the victims recorded on the videos, and the defendants' recorded actions depicting his voyeurism in setting up the camera.

<u>Whited II</u>, 506 S.W.3d at 447. In the video here, the victim obviously entered the bathroom to take a shower. The victim removed her clothes while using the bathroom. The camera was placed above the victim's head and aimed downward inside a very small bathroom. Due to the opaque nature of the shower curtain, the victim could not be observed while showering. The video did depict the victim nude, showing her private body areas, including her bare breasts, buttocks, and pubic area.[16] However, the camera was not particularly positioned to capture as much of the victim's private areas as possible or focus on her genitalia. Mostly, the victim, while outside the shower, could be perceived as completing ordinary grooming tasks, although she did briefly touch her nipples in a relatively innocuous manner.

We must hold that the video at issue does not rise to a level at which the trier of fact could reasonably find that it includes "sexual activity," defined as the "lascivious exhibition" of the minor's private body areas. <u>See</u> Tenn. Code Ann. §§ 39-17-1005(a)(1), -1002(8)(G); <u>Whited II</u>, 506 S.W.3d. at 447. Rather, the minor in the video is engaged "in everyday activities that are appropriate for the setting[] and are not sexual or lascivious within the ordinary meaning of those terms." <u>Whited II</u>, 506 S.W.3d. at 447. Accordingly, we reverse the Defendant's conviction for especially aggravated sexual exploitation of a minor.

The question remains what the remedy should be. The State, citing <u>State v. Parker</u>, 350 S.W.3d 883 (Tenn. 2011) (reversing second degree murder conviction and remanding with instructions to enter an amended judgment on reckless homicide), asks us to automatically enter a conviction on the lesser-included offense of attempted especially aggravated sexual exploitation of a minor. The Defendant requests a new trial.

At the risk of sounding redundant, this issue was once again addressed by the court in <u>Whited II</u> because the dissenting opinion in <u>Whited I</u> advocated for reducing the reversed convictions from especially aggravated sexual exploitation of a minor to attempted especially aggravated sexual exploitation of a minor. <u>See Whited I</u>, 2015 WL 2097843, at *13 (McMullen, J., dissenting). In remanding the case for a new trial on the lesser-included offense of attempt, the <u>Whited II</u> court examined the following:

"[W]here a conviction for an offense is reversed on appeal for insufficient evidence, double jeopardy protects the accused from retrial on <u>that</u> offense, but he may still be tried on lesser offenses if the evidence at the first trial was not insufficient, as a matter of law, to support a conviction of those lesser offenses." <u>State v. Maupin</u>, 859 S.W.2d 313, 317 (Tenn. 1993) (emphasis in original). Attempt is a lesser-included offense of the offense

---

[16] A visual of the pubic area was debatable, occurring, if it did, only briefly.

charged. Tenn. Code Ann. § 40-18-110(f)(3) (2012 & Supp. 2016). Our criminal code defines the inchoate offense of criminal attempt as follows:

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense: . . . Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(3).[17]

> . . . Our conclusion that the defendant did not produce material that is sufficient to support a conviction for the production of child pornography under the child sexual exploitation statutes "is not tantamount to a finding of insufficiency on" attempt. Cf. Maupin, 859 S.W.2d at 318. The facts in this case present a close question regarding whether the defendant intended to capture exactly what he recorded in the videos—minors engaged in everyday activities ordinarily done nude—or whether he intended to "cause a result that would constitute the offense" of production of child pornography by recording the minors engaged in a lascivious exhibition. Tenn. Code Ann. § 39-12-101[(a)](3). Considering the entirety of the record, "the evidence in the record is not so insufficient" so as to preclude a finding of attempted production of child pornography. Cf. Maupin, 859 S.W.2d at 318.

Whited II, 506 S.W.3d at 447-48 (footnote added).

However, in Whited II, the jury was not instructed on the lesser-included offense of attempt on those counts. Whited II, 506 S.W.3d at 448. Here, the jury was so charged, and the trial court was confident that the evidence "one hundred percent" supported an attempt conviction in this case. We agree. When an appellate court finds the evidence insufficient to support a conviction for the charged offense, it can direct a trial court to enter judgment on a lesser-included offense when the lesser-included offense was necessarily charged and proven at trial. See Parker, 350 S.W.3d at 910 (emphasis added) (citing United States v. Dhinsa, 243 F.3d 635, 674-75 (2d Cir. 2001) (recognizing that an appellate court may vacate a conviction for a greater offense and enter a judgment of conviction on a lesser offense where the evidence is insufficient to

---

[17] We have deleted the other two methods of committing criminal attempt because only the third was charged in this case.

support the greater but sufficient to support the lesser where the reviewing court "is convinced that the defendant will not be prejudiced as a result"); State v. Brown, 836 S.W.2d 530, 533, 554 (Tenn. 1992) (entering a judgment on the lesser-included offense of second degree murder where the evidence was insufficient to support conviction of greater offense of first degree murder); State v. Long, 45 S.W.3d 611, 622 (Tenn. Crim. App. 2000) (stating that, where evidence is not sufficient to support the greater offense but is sufficient to support the lesser-included offense, an appellate court may order reduction in the degree of the offense for which the defendant could be convicted)). Consequently, we reverse the Defendant's especially aggravated sexual exploitation of a minor conviction and vacate that charge. In its place, the trial court is instructed to amend the judgment order to reflect a conviction for attempted especially aggravated sexual exploitation of minor and to conduct a new sentencing on the modified conviction, a Class C felony. See id.; State v. Ronnie Ingram, No. W2011-02595-CCA-R3-CD, 2012 WL 5355694, at *6 (Tenn. Crim. App. Oct. 31, 2012) (likewise, based upon insufficient evidence, modifying conviction to lesser-included offense of attempt and remanding for a new sentencing hearing); see also Tenn. Code Ann. § 39-12-107(a) (grading attempt).

*III. Sentencing*

As his third issue, the Defendant contends that the trial court erred by applying enhancement factor (14)—The Defendant abused a position of private trust in a manner that significantly facilitated the commission or the fulfillment of the offense—to enhance his sentence for especially aggravated sexual exploitation from eight years to nine. See Tenn. Code Ann. § 40-35-114(14). The trial court placed "great significance" on this single enhancement factor, concluding that the "bathroom is the most private place anyone could hope to be[,]" and declined to employ any mitigating factors in sentencing the Defendant. We reject the Defendant's argument that his position as the victim's "step-father did not 'significantly facilitate' his ability to place a cell phone camera in the bathroom of the home." Respectfully, we agree with the State that "one does not often allow strangers or even neighbors into one's bathroom." It was because of the familial bond the Defendant shared with the victim that he had frequent access to the only bathroom in the home. "The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples" of occupying a position of public or private trust. State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999) (citing State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996)). Moreover, an adult "occupies a position of 'presumptive private trust' with respect to the minor" when the adult and child are members of the same household. Id. The record supports the trial court's application of this enhancement factor, and upon remand for resentencing, the trial court may properly reconsider this factor.

## CONCLUSION

For the reasons stated herein, we reverse the Defendant's conviction for especially aggravated sexual exploitation of a minor, and that charge shall be vacated. We impose in its stead a conviction of attempted especially aggravated sexual exploitation of a minor. This matter is remanded to the trial court for the entry of an amended judgment reflecting the attempt conviction and for resentencing on this modified conviction. The Defendant's convictions of unlawful photography and observation without consent remain intact.

_____

D. KELLY THOMAS, JR., JUDGE